Filed 3/14/23  P. v. Labarr CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PHILLIP EUGENE LABARR,<br><br>Defendant and Appellant. | F082622<br><br>(Super. Ct. No. F20905209)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Alvin M. Harrell III, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary, and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Defendant Phillip Eugene Labarr attacked a homeless woman after inviting her into a trailer on his parents' property. He was charged with attempted forcible rape (Pen. Code,[1] §§ 261, subd. (a)(2), 664; count 1), battery causing serious bodily injury (§ 243, subd. (d); count 2), assault with intent to commit rape (§ 220, subd. (a)(1); count 3), criminal threats (§ 422; count 4), and sexual battery by restraint (§ 243.4, subd. (a); count 5). The first amended information also alleged defendant had suffered two prior "strike" convictions within the meaning of the Three Strikes law. (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)). A jury found defendant guilty of the charged offenses in counts 2 through 4. On counts 1 and 5, the jury found defendant not guilty of the charged offenses, but guilty on each count of the lesser included misdemeanor offense of assault (§ 240). Defendant subsequently admitted the prior strike convictions. The trial court sentenced defendant on each of counts 3 and 4 to consecutive terms of 25 years to life. On count 2, the court imposed and stayed, pursuant to section 654, an upper-term sentence of eight years. On counts 1 and 5, defendant was sentenced to county jail terms with time served.

On appeal, defendant argues the trial court prejudicially erred in admitting evidence of his prior conviction for a sexual offense pursuant to Evidence Code section 1108. He also asks this court to review in camera the victim's mental health records, which the trial court reviewed and determined were not discoverable by the defense for use at trial. To the extent the court erred in declining to disclose the victim's mental health records, he argues cumulative prejudice. He additionally contends his convictions on counts 1 and 5 must be reversed because they are necessarily included within his conviction on count 3, a point which the People concede. Finally, he raises several challenges to the sentence, arguing: (1) the court had unrecognized discretion to sentence

---

[1] Undesignated statutory references are to the Penal Code.

2.

him to concurrent terms on counts 3 and 4 and erred in imposing consecutive terms; (2) the upper-term sentence on count 2 is unauthorized under section 1170, subdivision (b), as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill No. 567); (3) remand is required for the court to exercise its newly afforded discretion to punish defendant under a count providing for a lesser sentence, pursuant to section 654 as amended by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill No. 518); and (4) the abstract of judgment must be corrected to reflect the court's oral pronouncement that defendant's fines and fees were ordered stayed.

We accept the People's concession that counts 1 and 5 must be reversed and the associated sentence must therefore be vacated. In light of these reversals, we will remand for a full resentencing. As such, we do not address defendant's challenges to the sentence, which he may raise on remand. In all other respects, we reject defendant's contentions and affirm.

## FACTS

### I. The People's Case

At the outset of trial, the parties stipulated that defendant was convicted on April 13, 2005, of committing "a lewd act without force upon a 14-year-old minor" in violation of section 288, subdivision (c)(1).

### A. The Incident

On August 1, 2020, defendant was staying in a travel trailer behind a house on Ashlan Avenue in Fresno County. His parents lived in the house and his sister, Morgan M.,[2] lived in a mobile home on the same property with her husband. Defendant was not allowed to bring anyone on the property or to the trailer. However, in the two weeks prior to August 1, 2020, Morgan caught defendant attempting to bring A.S. onto the

---

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials. No disrespect is intended.

property on two occasions. On these occasions, Morgan alerted her parents, who told A.S. to leave. Defendant and his stepfather argued over the incidents.

On August 1, 2020, Morgan exited her mobile home to check the mail. She did not see or hear anyone else on the property at that point. As she returned, she heard screams of "Help, help, help me, help me," and saw A.S. running near a parked van, adjacent to defendant's trailer. A.S. seemed confused and was going the wrong way to get out of the property. Morgan saw that A.S.'s face was "real swollen and purple" and blood was "pumping" from a large gash on her leg. A.S. did not appear to be in pain but acted "frantic and scared and confused." Morgan asked, "What's wrong?" and A.S. responded that she had kicked out the trailer window because "he" would not let her out and was trying to rape her. Morgan assumed A.S. was referring to defendant, because A.S. was coming from the trailer and the only other male on the property was Morgan's father, who was injured and in bed. A.S. repeatedly stated, "Look at my face. Look at my face," and tried to leave. Morgan said she needed to call 911, but A.S. continued to try to leave.

After a few minutes, defendant came from behind the trailer. Morgan told him to stop. She told A.S. she would not let anything happen to her and would not let defendant come near her. Defendant went into his parents' house to tell "his side of the story to [his] mom."

Morgan told A.S. she would help her leave but needed to attend to her leg first or A.S. would bleed to death. A.S. said she was scared and said, "I don't want to be here, I don't want to be here," as she continued walking down the driveway. Morgan grabbed one of her husband's dirty work shirts that was in the yard to wrap A.S.'s leg. Once outside the driveway, Morgan told A.S. they needed to get something clean to apply pressure to the leg to stop the bleeding. A.S. initially agreed and Morgan went into her parents' house and yelled for her mother to help. However, when Morgan came back outside, A.S. was already halfway down the street, walking very quickly.

Artemia A. was driving down Ashlan Avenue with her friend Celia A., when she saw A.S. yelling and flailing her arms. Artemia stopped nearby to pick up her cousin, and told her cousin to hurry up because she thought A.S. was drunk or on drugs. However, Artemia's cousin pointed out that A.S. was bleeding a lot. Artemia got out of her vehicle and noticed A.S.'s lips looked black and blue; her eye was black, blue, purplish, and swelling; and she had an injury to the bridge of her nose. She had an injury on her right foot that was bleeding "like an open faucet." Artemia applied fabric to the injury to try to stop the bleeding. A.S. said, "He's coming. He's coming," and "he's dangerous, he's dangerous." She also said, "Trae cohete. Trae cohete," which Artemia understood to mean "[g]un." She also said the man had a knife and, "He will kill me." A.S. asked Celia to call an ambulance and she did so. A.S. looked scared and tried to climb into Artemia's vehicle. Artemia told A.S., "No," and tried to sit her down, but she fell to the ground. Law enforcement arrived in approximately three minutes.

Fresno County Sheriff's Deputy M. Perez responded to the scene. He saw A.S. on the ground, and observed lacerations on her right ankle and foot with a lot of blood. He applied a "pressure wrap" in an attempt to stop the bleeding. A man, later identified as defendant, approached walking a bike. A.S. said, "That's him," and said defendant tried to rape her and had a gun and a knife. Perez testified defendant's hands appeared dirty, his right knuckles appeared swollen, he had a laceration on his pinkie, and he had a towel wrapped around his left hand. A.S. was subsequently transported to a hospital.

## B. Medical Treatment

Dr. L. Sue is a trauma surgeon who treated A.S. at the hospital on August 1, 2020. Upon arrival to the hospital, A.S. had very low blood pressure, requiring the hospital's highest tier response. She had a "very deep laceration" to her leg with "pulsating blood" coming from the wound, which Sue determined came from a laceration to the anterior tibial artery. She also had a broken nose and bruising to the left side of her face. The broken nose was "relatively fresh," within the past three to five days, and the bruising

was acute and appeared to have "just occurred." A.S. was extremely anxious and resisted removal of her clothing. Sutures and staples were used to close the wound, and A.S. was given pain medication.

A.S. underwent a Sexual Assault Response Team examination at the hospital on August 1, 2020. The nurse who conducted the examination testified A.S. was "tearful, she looked anxious and scared, and she looked exhausted." The nurse did not find any injuries to A.S.'s vaginal area. Swabs from A.S.'s breasts contained male DNA in the non-sperm fractions. Swabs from A.S.'s neck contained male DNA in both the non-sperm and sperm fractions. There was insufficient male DNA in the samples to compare them to any reference samples.

### C.    A.S.'s Reports of the Incident

#### i.    Initial Interview

Perez interviewed A.S. at the hospital. A.S. stated that she had been at the Ashlan location for four days, waiting to meet her husband, Nato L. She was staying with a man named John, who had been trying to convince Nato to allow John to have sex with A.S. On the fourth day of her stay, which was August 1, 2020, John threatened A.S. and told her he wanted to have sex with her. A.S. reported that he tried to pull her pants down and touch her vagina. She did not know whether her vagina was exposed. He also tried to put his penis in her vagina and she saw his naked penis. She was not able to provide details as to how this happened. Additionally, she reported John pointed a black and silver gun at her. She reported she received her facial injuries when she was kicked and "socked" seven or eight times with a balled first. She reported she received the lacerations on her foot and ankle by kicking a window when John did not allow her to leave through the front door. She could not describe how John prevented her from leaving. She also reported that John had broken her ankle but she did not know how to describe how it happened.

### ii. Subsequent Interviews

Later, on August 1, 2020, Deputy Sheriff T. Avila and Detective J. Gloria conducted three recorded interviews of A.S. Avila testified regarding the interviews, which also were played for the jury. He explained that, at the time of the interviews, A.S. had swelling on her eye, a laceration above the bridge of her nose, bruising, redness on her forehead and cheeks, and blood on her lips. By the conclusion of one of the interviews, A.S.'s eye had swollen shut.

When asked about her injuries during the interview, A.S. explained that a man had hit her and tried to rape her. This occurred "down the street" at a trailer. She did not know the man's name. She initially stated she did not know how she met him, but later stated she met him at a store four days prior. The man told her he would take her somewhere safe and then took her to the trailer. Her sons tried to visit her at the trailer but the man would not let them in. A.S. could not remember her sons' names.

A.S. described the trailer as having two mattresses, one white and one orange. She was on the white mattress and the man was on the orange one. She had just woken up when the man "socked" her, and tried to take off her clothes. He held her arms and threatened to beat her up if she did not remove her clothes. He had a gun and threatened to throw her out naked if she did not have sex with him. He told her no one would do anything about it. He got on top of her, pulled her blouse up, and tried to rub his penis on her chest. She stated that his penis was both hard and soft. This lasted about a minute. He took off her shorts and tried to put his penis inside of her. She did not know or could not remember whether he was successful.

A.S. stated the man was trying to kill her and she almost died, but she could not explain what the man did. She struggled with the man and kicked the windows, breaking the glass. The man grabbed her foot and twisted it and her leg "went snap and snap." She screamed and he slapped her face and tried to smother her with a pillow. He then got off her and let her leave. He told her not to come back or "tell" on him, or he would find

7.

her and kill her. A.S. thought the man let her go because he heard A.S.'s daughter screaming. A.S. could not remember her daughter's name.

A.S. left out the door of the trailer. She "took off" as fast as she could. A.S. encountered her daughter at the front of the house and her daughter tried to help her. Her daughter tied a shirt or a rag around A.S. to stop the bleeding. A.S. was afraid of her daughter because she was brainwashed by the man, so A.S. left. On the street, a woman helped her and called an ambulance for her. The man who hurt her came out to threaten her again but the police took him.

A.S. acknowledged that she had used methamphetamine by herself at the trailer two days prior to the incident. A.S. explained that she was not homeless and lived in Visalia. She was in Fresno waiting for her husband, Nato. According to A.S., Nato kept "trying to meet up" with her but the man would not let him through. She did not know where Nato lived.

Avila acknowledged that A.S. initially did not provide many details regarding the encounter, but did so in subsequent interviews after being advised she needed to provide more information for law enforcement to be able to arrest someone. He confirmed that A.S. did not mention a knife being used in the encounter and did not mention being kicked. He also confirmed A.S. had not mentioned being smothered by a pillow in her interview with Perez. He further testified that neither Nato nor any of A.S.'s relatives were at the scene.

### iii. Trial Testimony

A.S. testified at trial. She testified that her right leg was injured approximately four months prior to trial when she was "attacked by a bad person that was doing drugs." She explained the injury occurred at "one of [her] old trailer vacation homes on [her] properties that [she] had for a lot of years." She had hidden the trailer there, on property she had purchased, to surprise her husband. She had been staying at the trailer for about a week or a week and a half, and had invited the man who attacked her to be her guest

because she did not want to be alone. Her sons and daughters also sometimes lived at the trailer or went there to shower. Her husband Nato also lived in the trailer and worked in the fields.

She explained that the man put a knife to her neck and slit her leg two times. She also received a concussion. She underwent surgery for the leg injury and her skin was sewn back together. She still had ankle pain at the time of trial and suffered from trauma and depression as a result of the injury.

A.S. explained that she has been at the trailer on Ashlan waiting for her husband, Nato. Nato had been trying to get in the trailer but "he kept shooing the dogs on him." A.S. was inside the trailer when a man she was with would not let her get up and slammed the window on her foot. He had a knife, a wrench, and a black gun. He socked her in the face three to five times and hit her with the wrench. He was on top of her and trying to kill her. He told her he was going to kill her and threatened to take off her clothes. He threatened her because she knew about the "other two girls in the canal." He was trying to rape her and he grabbed her arms and pushed her down. He put his body on top of her and he thought she would not get away. He tried to penetrate her private area with his private parts. She initially denied seeing his penis, but later testified he had his pants down to his knees. She later testified he was fully naked and erect, and forced her to look at his penis by holding her by the hair. A.S.'s pants never came off but the man tried to take them off. Her vagina was not "[i]nvaded," but he tried to penetrate her.

As A.S. struggled with the man, he twisted her ankle between his hands and it broke. He busted one of the trailer windows open. A.S. grabbed the wrench from his hand and hit him with it more than five times on his face and head. She also busted one of the windows open with the wrench while she was screaming for help. She later testified she kicked the window out and cut her leg at that time. She explained the cut was from "glass and a knife." She used a shard of glass to protect herself from the man.

9.

A.S. used a torch lighter and mace on the man's face. She initially testified she grabbed the knife from him and stabbed him a couple of times. She later testified she did not stab him, but used the knife to keep him from chasing her. The man had a gun, which belonged to A.S. and which she gave to the officers. No one used the gun during the encounter. Ultimately, she could not remember whether the incident where the man socked her in the face and the incident where he laid on top of her occurred on the same date, but testified both incidents involved the same man. She eventually got away from the man, but he kept saying he wanted money.

A.S. recalled telling an officer at the hospital that the man told her he wanted to have sex with her and that he tried to put his penis in her vagina. She recalled telling the officer the man's gun was silver and black. She told the officer the man tried to beat her up so he could rape her.

The man was a "young white Caucasian," who was 23 or 32 years old. When shown a picture of defendant, she initially identified him as "one of the super heroes and the clones that helped me catch . . . him." She explained that the "superhero[]" and one of his brothers were put in a police car " 'cause his clone tried to mix them around." The superheroes "came down on a ship and around the corner." Ultimately, however, they put the "real one that was bad" in the police car. She explained that the person in the photograph was "the good son" who tried to help her in the trailer by holding the man back. When showed another photograph of defendant, she explained the photograph depicted another clone. However, later in her testimony, she stated the person in the photograph was the person who attacked her in the trailer. She testified that the person who attacked her was not in the courtroom. She also testified the person who hurt her was named John, he was approximately 26 years old, and she had known him all his life. She then testified that John helped the person who tried to put his penis in her vagina, and there were "quite a few" bad men.

10.

A.S. testified that she used approximately $20 worth of methamphetamine before she went to the trailer, and approximately $23 worth while she was in the trailer. She had used methamphetamine all her life.

### D. Further Investigation

The detective who responded to the exterior of the trailer did not see a knife, gun, or bloody clothing at the trailer. A trail of what appeared to be blood lead from the property, down the driveway, and out to the street. Police saw a broken window and what appeared to be blood in defendant's trailer.

## II. Defense Case

### A. Defendant's Testimony

Defendant testified on his own behalf. He acknowledged he had prior felony convictions for making criminal threats in 1999, a lewd act without force on a 14 year old in 2005, and felony animal abuse in 2014.

As of August 1, 2020, defendant had been staying at the trailer for two and a half days. He met A.S. approximately a week before, when she waved him down outside a big box store and asked for money. He gave her a few dollars and sat and talked with her for a while. He told her where he lived in case she ever needed a place to eat. He testified that he did not see her again until 7:30 a.m. on August 1, 2020, when she showed up at the door of his trailer. He denied that A.S. had ever been on the property before. On August 1, 2020, he noticed A.S. had bruising on the left side of her face. She would not tell defendant what happened. He let her into the trailer and made her an instant soup, and she then went to sleep. A.S. slept on the white mattress, fully clothed, with a brown top sheet. Defendant went to sleep on a different bed at the front of the trailer. He was fully clothed at all times. No one else was in the trailer.

Defendant awoke around 12:45 or 1:00 p.m. A.S. was still asleep and defendant went into his parent's house to plug in his phone and take a shower. After approximately 20 minutes, he returned to the trailer. He brought A.S. some pineapple and she woke up

11.

and ate it before going back to sleep. Defendant laid on his bed, playing games on his phone and eating an instant soup. After another 15 or 20 minutes, A.S. started "moaning and groaning real loud in her sleep." She also started saying the name John. Defendant tried to wake her up by tapping on the bottom of her foot with his hand. A.S. opened her eyes and started kicking. She kicked out the window. Defendant saw broken glass and blood. He placed his hands on A.S.'s knee area to push her legs away from the window so she would not hit the window again and get hurt. A.S. sat up, grabbed a piece of glass, and cut his hand. He did not get on top of the bed or on top of A.S. at any point. Defendant backed up to try to find something to put on his hand. He did not see where A.S. went after that.

Defendant went outside and did not see A.S. in the driveway or near the front yard. He did see his sister. He went to his parents' house and told his mom to call the police because "she had kicked out the window and cut herself real bad, and she was bleeding." His mother called the police and he went out the front gate. He did not see anyone so he got his bike and walked down the street. He saw the police and a "commotion" and approached the police to inform them of what happened.

Defendant did not have a gun or a knife in the trailer. He knew that A.S. kept a knife in her backpack because she had showed it to him when they first met and asked him to sharpen it. She did not bring out the knife inside the trailer or use the knife on defendant.

Defendant's hands were dirty in photographs taken after the incident because he works on cars and bicycles. His right fist is permanently swollen due to broken bones. On the date of the incident, defendant had genital and anal warts, extending from the tip of his penis to his anus, which caused him a lot of pain. He had seen a doctor for the warts but declined both medication and surgical treatment.

Defendant was not hoping to have sex with A.S. He had not had sex for six months prior to the incident. He used methamphetamine three to four days before the incident. He did not use methamphetamine with A.S.

On cross-examination, defendant gave additional details regarding his prior history with A.S. He again stated that he met A.S. at a big box store approximately one week prior to the incident and gave her a few dollars because she was hungry. He denied telling officers on the night of the incident that, when he met A.S., he told her he did not have money but had food at his house. He acknowledged he invited her to his house so he could give her food. However, when they walked to a nearby restaurant, A.S. told defendant she was tired and wanted to sleep. Defendant borrowed a blanket from a homeless person he knew and gave it to A.S., and she fell asleep behind the restaurant. Defendant left her there and went home, and when he returned the next day A.S. was gone.

Defendant encountered A.S. later that day in a different area and took her to an empty lot with a large tree, where A.S. sat while defendant went to get her something to eat. Defendant did not recall telling detectives that he invited A.S. back to his trailer so he could feed her, and he attributed his lack of recollection to memory issues. Late at night on the following day, defendant walked A.S. to the trailer, where they encountered his stepfather. Defendant's stepfather was upset that A.S. was on the property because defendant was not supposed to have visitors, and he ran her off. Defendant initially testified A.S. returned to defendant's trailer the following morning and he fed her and then she left. He encountered her later that day, staying down the street near some trees. He later testified, however, that A.S. did not return to the trailer until the morning of August 1, 2020.

## B.    Defendant's Medical Issues

Dr. S. Kesavaramanujam is a general and thoracic surgeon who treated defendant for extensive warts. He explained genital warts can be present on the penis, scrotum, anus, and the area between the anus and the scrotum. Unless treated, the warts will stay with the person "for a while." Genital warts can be treated through topical medication, liquid nitrogen, and other agents.

## C.    Hospital Social Worker

C. Dezan was a licensed clinical social worker at the hospital A.S. attended on August 1, 2020. A.S. was upset and told Dezan she was assaulted, she was very tired, and she did not want to go into a lot of detail. She told Dezan she was not raped.

## III.    Rebuttal

Gloria and Avila interviewed defendant on August 1, 2020, at the Fresno County Sheriff's Office headquarters. Gloria noted on that date that defendant's hands "were rough, and they looked a little swollen." Defendant stated he had warts on his testicles going to his anus, which were large and painful, but he did not have warts on his penis. During the interview, defendant claimed he had short-term memory loss.

Defendant told Gloria that he had met A.S. a total of three times, beginning approximately one week prior. He met A.S. for the first time at the big box store and he invited her to his house to eat. However, she grew tired on the walk to his house and instead went to sleep behind a restaurant while defendant went home. The next day, he saw her again and she again told him she was hungry. They went to defendant's trailer but defendant's stepfather came out and got upset. At one point in the interview, defendant said A.S. left at that time; at another point in the interview, he said she went inside and ate some soup, then left. He met up with A.S. for the third time on August 1, 2020.

14.

Gloria testified that defendant described A.S. as having marks or bruises on her face and reported that it looked like she got beat up. A.S. did not want to tell defendant how she obtained the marks or bruises and he did not push the issue. Later in the interview, however, defendant stated that he did not know anything about A.S.'s face or look at her face. Defendant acknowledged he may have hit A.S. and caused her facial bruises while trying to defend himself, but could not recall if he did.

Gloria testified that defendant reported A.S. woke up screaming about someone named John and also that A.S. called defendant John. After A.S. kicked through the window, defendant bent over and grabbed her ankles or legs to hold her still, then put his forearms over her knees and lower body to prevent her from injuring herself more. The officer asked if this would have meant defendant's head was over A.S.'s crotch area, and defendant said yes, but that he had not thought of that. Defendant initially stated his shorts had not fallen down and his penis was never exposed. However, later in the interview, he stated his shorts were untied and may have fallen down during the incident, but his penis was never exposed. He initially stated that A.S.'s pants were never unbuttoned, but then stated that she had used the bathroom in the trailer so he did not know if she unbuttoned them.

## DISCUSSION

### I. EVIDENCE CODE SECTION 1108

Defendant argues the trial court prejudicially erred by admitting evidence of his prior conviction involving violation of section 288, subdivision (c)(1). He contends the prior conviction evidence was irrelevant and, additionally, its probative value was substantially outweighed by the risk of undue prejudice and jury confusion. He further contends the admission of this evidence violated his federal constitutional right to due process. We disagree.

### A. Additional Factual and Procedural Background

The People moved in limine to admit defendant's prior conviction under Evidence Code section 1108. The defense moved in limine to exclude this evidence.

The People represented that the victim of the prior offense was approximately 14 years old when defendant had sex with her and his codefendant in that incident orally copulated her, which acts were performed together. According to the People, "[t]here was no force used by either [d]efendant." The People asserted the testimony of the victim would take approximately one to two hours, and thus would not require an undue consumption of time. Later, at the hearing on the motions in limine, the People represented that they would seek to admit certified court records pertaining to the prior conviction and would not present testimony from the victim or others involved in the offense or investigation. The People thus estimated the presentation of this evidence would consume less than 10 minutes. The People argued the prior offense was similar to the instant offense, inasmuch as they were both "sexual assault crime[s]." However, because the victim in the prior offense engaged in the sexual activities voluntarily and was not hit, the evidence was not as inflammatory as the instant case. Furthermore, the People argued the evidence was not stale or too remote, and would not confuse the jury.

The defense represented the victim in the prior offense was 15 years old, and "the prior incident involved consensual sexual encounters and a dating relationship between the victim and [defendant] when [defendant] was 29 [years old]." The defense explained, "The relationship also apparently involved [defendant's] then-wife, who was a co-defendant in the criminal case; the co-defendant admitted to having consensual sexual encounters between herself, [defendant], and the victim. Furthermore, [defendant] had apparently known the victim for a long time and the victim described him at times as either a 'family friend' or as 'cousin' by marriage. Essentially, [defendant] and the minor victim had known each other for at least several years. When the minor victim ran away from her abusive household, she began staying with [defendant] and his wife at different

16.

locations. The victim apparently stayed with [defendant] and his wife for several weeks." The defense argued the conduct involved in the prior conviction was dissimilar from the instant offense and the offense occurred 16 years prior, such that the probative value of the prior conviction was very low. Defense counsel argued the evidence was therefore "far more prejudicial than probative."

The court determined the evidence had some probative value, but only inasmuch as both offenses involved sex or attempted sex. The court also noted the prior offense occurred approximately 16 years prior. However, the court determined evidence of the prior offense was not stronger or more inflammatory than the instant offense, was not likely to confuse or distract the jury, and would not unduly consume time. Accordingly, the court determined the probative value of the prior offense was not substantially outweighed by its prejudicial effect or the likelihood of undue consumption of time or jury confusion, and the evidence therefore was admissible. The court offered the parties an opportunity to meet and confer regarding the wording that would be used to present the offense to the jury.

Later in the hearing, defense counsel asked the court to revisit its ruling with regard to the prior conviction evidence. Counsel argued the prior conviction was extremely inflammatory and prejudicial because the victim was a minor and the jury would not hear that the relationship was "consensual." Counsel again argued the probative value of the evidence was low because the prior offense, unlike the instant offense, did not involve the use of force or a victim similarly aged to defendant who was a relative stranger. Defense counsel asked the court to find the evidence was more prejudicial than probative. The prosecutor provided the court with a stipulation agreed to by the parties, which would inform the jury that defendant had committed "a lewd act without force upon a 14-year-old minor." The court took the matter under submission.

That afternoon, the parties provided additional argument regarding the prior conviction evidence. Defense counsel again argued the probative value of the prior

17.

sexual offense was low, given its dissimilarity to the current offense and its age. Additionally, because the victim of the prior offense was a minor, defense counsel argued the offense was highly inflammatory. The prosecutor argued the victims in both cases were "fragile," and "defendant is preying on fragile people." Additionally, defendant knew both victims and the offenses were not random. The prosecutor agreed that the offenses were generally dissimilar in that the current offense involved force while the prior did not, but argued this rendered the prior offense less inflammatory and less likely to cause confusion.

The court agreed the cases were somewhat similar, inasmuch as each involved a "vulnerable" victim who was known to the defendant. The court was satisfied that the probative value of those factors was not substantially outweighed by the prejudicial effect of the evidence, undue consumption of time, or likelihood of jury confusion. Accordingly, the court maintained that the evidence could be admitted.

The jury was read the following stipulation at the outset of trial: "Prosecution and Defense both stipulate that [defendant] was convicted on April 13, 2005 as a felony, Penal Code [s]ection 288[, subdivision] (c)(1), which is a lewd act without force upon a 14-year-old minor in Fresno County Superior Court, case number F04903593-2." During his testimony, defendant acknowledged he had been convicted in 2005 of committing a lewd act without force upon a 14-year-old minor.

Over defense counsel's objection, the jury was instructed with regard to the stipulation as follows:

> "The People and the defense both stipulated that [defendant] was convicted on April 13, 2005 of a felony Penal Code [section] 288[, subdivision ](c)(1), a lewd act without force[3] upon a 14 year old minor in Fresno County Superior Court case # F04903593-2.

---

**3** In reading the jury instructions, the court omitted the words "without force."

18.

"You may, but are not required to, conclude from the evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit Attempted Forcible Rape, and/or Assault With Intent to Commit Rape, and/or . . . Sexual Battery By Restraint as charged here.

"This stipulation is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of Attempted Forcible Rape, and/or Assault With Intent to Commit Rape, and/or . . . Sexual Battery By Restraint. The People must still prove each charge beyond a reasonable doubt."

During closing argument, the prosecutor briefly cited to the stipulation to argue the jury was permitted to conclude defendant was disposed or inclined to commit sexual offenses. The prosecutor also argued the jury could consider defendant's three felony convictions, including the conviction for committing a lewd act with a minor, when evaluating defendant's credibility.

### B.       Applicable Law

"[E]vidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a); accord, *People v. Jackson* (2016) 1 Cal.5th 269, 299.) But Evidence Code section 1108, subdivision (a) provides an exception to this rule: "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." " 'In short, if evidence satisfies [Evidence Code] section 1108, and is not excluded under [Evidence Code] section 352, admission of that evidence to prove propensity is permitted.' " (*People v. Dworak* (2021) 11 Cal.5th 881, 899 (*Dworak*).)

Evidence Code section 1108 "does not purport to make irrelevant evidence relevant." (*People v. Earle* (2009) 172 Cal.App.4th 372, 400.) Thus, evidence offered under this section "must have some tendency in reason to show that the defendant is

19.

predisposed to engage in conduct *of the type charged*." (*Id*. at p. 397.) "We review for abuse of discretion a trial court's rulings on relevance . . . ." (*People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

Under Evidence Code section 352, evidence is inadmissible if the court determines "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid*.) The probative value of evidence of prior sexual offenses often turns on the similarity between the prior offense and the current offense. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 531–532 [discussing admission of propensity evidence under Evid. Code, § 1109].) Undue prejudice arises if the evidence " 'poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome." ' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 144.) "The potential for such prejudice is 'decreased' when testimony describing the defendant's [prior] acts is 'no stronger and no more inflammatory than the testimony concerning the charged offenses.' " (*Ibid.*) With regard to prejudice, a trial court "must engage in a careful weighing process" when determining whether to admit evidence under Evidence Code section 1108. (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).) "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Ibid*.)

A trial court's ruling under Evidence Code section 352 is reviewed for abuse of discretion. (*People v. Clark* (2016) 63 Cal.4th 522, 586.) "As a reviewing court, we

20.

accord deference to a trial court's determination that the probative value of a particular piece of evidence outweighs any danger of prejudice." (*Dworak*, *supra*, 11 Cal.5th at p. 899.)

###   C.    Analysis

The trial court did not abuse its discretion in admitting limited evidence regarding defendant's prior sexual offense.

First, the trial court did not abuse its discretion in concluding the evidence was at least minimally relevant. As the court noted, both the prior offense and the current offense involved the allegation that defendant had committed, or attempted to commit, sexual acts with a vulnerable individual who was known to him. Thus, despite other dissimilarities between the two offenses, and the age of the prior offense, the prior offense had "some tendency in reason to show that the defendant is predisposed to engage in conduct *of the type charged*." (*People v. Earle*, *supra*, 172 Cal.App.4th at p. 397.)

Nor did the trial court abuse its discretion in determining the probative value of the prior offense was not substantially outweighed by its prejudicial effect, or the risk of jury confusion or undue consumption of time. Plainly, a prior conviction of a sexual offense against a minor may prejudice a defendant for its tendency to show the defendant is predisposed to engage in such conduct against minors or other vulnerable individuals. However, the stipulation that was read to the jury removed from the jury's consideration the most inflammatory details regarding the prior offense, including the depth of defendant's preexisting relationship with the minor, the extreme vulnerability of her circumstances, and his then-wife's concurrent involvement in the offense. (See *Falsetta*, *supra*, 21 Cal.4th at p. 917.) Additionally, the jury was informed the minor involved in the offense was 14 years old (as opposed to a very young child) and that the incident was "without force," further reducing the prejudicial effect the evidence may have had. Moreover, the prior offense was referred to only briefly, and therefore was not likely to

confuse, mislead, or distract the jurors from their main inquiry, nor to result in undue consumption of time. In light of the foregoing, the trial court did not abuse its discretion in determining that the risk of prejudice, jury confusion, and consumption of time did not outweigh the probative value of this evidence.

Lastly, we address defendant's claim that the admission of the prior sexual offense conviction violated his federal due process rights. Our Supreme Court has upheld the constitutionality of the admission of Evidence Code section 1108 evidence, provided the evidence is subject to an Evidence Code section 352 analysis. (*Falsetta*, *supra*, 21 Cal.4th at pp. 917-918.) Here, the court expressly evaluated the evidence under Evidence Code section 352 and concluded it was admissible. We have found no abuse of discretion. Defendant was afforded the safeguards required to satisfy due process.

## II.   DISCLOSURE OF VICTIM'S MEDICAL RECORDS

Defendant asks that we independently review A.S.'s sealed medical records to determine if the trial court erred in ruling the records were not discoverable by the defense. The People do not object to our independent review of the records.

### A.   Additional Procedural Background

Defendant moved in limine for the court to review in camera A.S.'s mental health records from the Tulare County Health and Human Services Agency and "Kaweah Delta Mental Health Hospital"[4] (boldface omitted) to determine whether the records were discoverable to the defense. In support of this request, defense counsel noted that A.S. had made "delusional" statements to law enforcement, which may have been attributable to mental illness. Defense counsel suggested the mental health records may establish A.S. has a history of "persecutory delusions," which "could give rise to false accusations

---

[4] It appears the name of the relevant organization is Kaweah Health Mental Health Hospital. For brevity, we will refer to this organization as Kaweah Health.

22.

of wrongdoing." Defense counsel asked that any records in this regard be released to the defense to protect defendant's due process and trial rights.

The People moved in limine to exclude, on hearsay grounds, any statements made by A.S. to medical or mental health professionals and contained within the mental health records. The People also suggested defendant's records request was untimely because the parties were no longer able to serve witnesses privy to those statements. Finally, the People argued the records were irrelevant, would lead to undue consumption of time, and would confuse and mislead the jury.

At the hearing on motions in limine, the People again objected to release of the records, arguing A.S.'s mental health was not on trial. The People again suggested the request was untimely because it was too late to subpoena doctors to testify regarding A.S.'s mental health. Defendant pointed out he was not entitled to the records prior to trial, and the request therefore was not untimely. Defendant further argued the records were necessary to impeach A.S.'s credibility during cross-examination.

The court described defendant's concerns regarding A.S.'s mental health as "legitimate" and stated defendant was entitled to have the court review the records in camera. The People argued the records should be excluded under Evidence Code section 352, because A.S. would be present and could be asked about her mental health history. Defendant argued the records would be relevant in the event A.S. denied having any mental health history. The People asserted it would be "blatantly obvious" A.S. "suffers from mental health issues."

The court determined it would review the records in camera, but noted it had received records only from Kaweah Health. Defense counsel agreed to contact the Tulare County Health and Human Services Agency regarding the status of the remaining records.

That afternoon, the court informed the parties it had reviewed "about a third" of the records from Kaweah Health and had determined neither party was entitled to receive or review the records. However, the court determined there was "some relevance as to a diagnosis in a mental health history." The court initially suggested it would make findings based on the Kaweah Health records that could be used to impeach A.S. if she was not forthcoming regarding her mental health history. However, the court subsequently noted the Kaweah Health records pertained to a hospitalization in January 2021, whereas the offense occurred in August 2020. The court then stated it would review the relevant dates to determine whether the records contained any information pertaining to A.S.'s mental health at or around the time of the offense. Nonetheless, the court stated it was "going to allow certain information to be put before the jury pertaining to the victim's mental health history that's contained in those medical records."

The following day, defense counsel informed the court that the Tulare County Health and Human Services Agency agreed to resend their records to the court. The court informed the parties it had completed its review of the records from Kaweah Health and determined that all the records pertained to January 2021. The court noted that the records contained a statement referring to past mental health issues, but the court could not determine the source of that information. Accordingly, the court determined, it would not release any of those records to the parties.

That afternoon, following a hearing regarding A.S.'s competency to testify, defendant again asked the court to release the Kaweah Health records, or at least information from those records that would be relevant to cross-examining A.S. regarding delusions and paranoia. Defense counsel argued it was for the jury to decide whether records from January 2021 had any weight with regard to A.S.'s mental health status at the time of the incident. The court again disagreed, and stated there was no foundation in the records to suggest A.S. had "any sort of mental health issues, delusions, or anything

else" on the date of the incident. The court emphasized the records contained only a "general statement that says that she has a history of mental health issues."

A few days later, during jury selection, the court received and reviewed the records from the Tulare County Health and Human Services Agency. The court conducted an in camera review of the records and stated, "Pursuant to Evidence Code [s]ection 352, the [c]ourt finds that no information contained in those records is admissible."

Partway through the People's direct examination of A.S., defendant renewed his request for A.S.'s mental health records. The court denied the request and reiterated its determination that the records from the Tulare County Health and Human Services Agency were inadmissible under Evidence Code section 352 and the records from Kaweah Health pertained to events after the offense and were therefore irrelevant.

## B.    Applicable Law

Psychotherapy records are privileged and subject to limitations on disclosure. (Evid. Code, § 1014; see Welf. & Inst. Code, § 5328.) "[T]he psychotherapist-patient privilege is 'rooted in the imperative need for confidence and trust.' " (*Jaffee v. Redmond* (1996) 518 U.S. 1, 10 [discussing psychotherapist-patient privilege under the Federal Rules of Evidence].) "Effective psychotherapy . . . depends upon an atmosphere of confidence and trust in which the patient is willing to make a frank and complete disclosure of facts, emotions, memories, and fears. Because of the sensitive nature of the problems for which individuals consult psychotherapists, disclosure of confidential communications made during counseling sessions may cause embarrassment or disgrace. For this reason, the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment." (*Ibid.*)

As a result, a trial court is not required, during pretrial proceedings, to review or grant discovery of privileged records maintained by third-party psychotherapy providers. (*People v. Hammon* (1997) 15 Cal.4th 1117, 1119 (*Hammon*).) In other words,

"psychiatric material is generally undiscoverable prior to trial."[5] (*People v. Gurule* (2002) 28 Cal.4th 557, 592.)  "Rather, access to such information must await a showing of materiality during trial, with the trial court balancing the defendant's need for cross-examination with the policies the privilege is intended to serve."  (*Facebook, Inc. v. Superior Court* (2017) 15 Cal.App.5th 729, 740; accord, *Hammon*, at p. 1127.)  The determination of whether psychotherapy records are discoverable is made by the trial court in camera.  (See *Facebook, Inc. v. Superior Court*, at p. 740.)

On appeal, we review the nondisclosed records to determine whether the trial court abused its discretion in rejecting disclosure of the records.  (*Dworak*, *supra*, 11 Cal.5th at p. 912.)

### C.     Procedural Issues

A.S.'s confidential medical records were not initially included in the record on appeal.  On August 20, 2021, defendant requested that the record be augmented to include these records.  We granted the request and ordered the sealed medical records to be transmitted to this court and made available only to the court.  On September 22, 2021, the exhibit clerk for the superior court filed a declaration stating the records from the Tulare County Health and Human Services Agency had been destroyed after sentencing pursuant to Evidence Code section 1560, subdivision (d).  The declaration did not mention the records from Kaweah Health.  Nonetheless, no records from Kaweah Health were transmitted to this court at that time.

---

[5] In *Facebook, Inc. v. Superior Court (Hunter)*, S230051, our Supreme Court granted review in part to determine whether an order barring pretrial access to requested records violates a defendant's right to compulsory process and confrontation under the Sixth Amendment or a defendant's due process right to a fair trial, and whether to limit or overrule *Hammon*.  However, the court ultimately declined to reach these issues. (*Facebook, Inc. v. Superior Court (Hunter)* (2018) 4 Cal.5th 1245; see *Facebook, Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329, 339.)  The court again declined to reach these issues in *Touchstone*, at page 338.

On November 24, 2021, defendant filed a motion for remand, requesting the trial court be ordered to (1) reacquire the medical records it had reviewed in camera, (2) certify they are the same records previously reviewed, and (3) arrange for those records to be filed as a sealed record in this court. We granted the request and ordered the superior court to (1) order the files from the custodian of those files; (2) conduct in camera proceedings to review the files and prepare a confidential settled statement; (3) state whether the files were the same as previously viewed; and (4) state whether any files previously reviewed were missing.

On March 23, 2022, an augmented clerk's transcript and augmented confidential clerk's transcript were filed in this court. The augmented clerk's transcript contains the trial court's February 17, 2022 order for Kaweah Health to provide A.S.'s records from December 25, 2020 "through present."[6] A confidential settled statement contained in the augmented confidential clerk's transcript states that the court reviewed the records provided in response to that order and determined they are the same files previously reviewed by the court.

We note, however, that many of the records from Kaweah Health contained in the augmented confidential clerk's transcript pertain to medical services provided on a date after trial of this matter had concluded. Because these records did not exist during trial, the court could not have reviewed them during trial or determined at that time whether they were material and discoverable. Accordingly, we do not include such records in our review.

---

[6] The order mistakenly lists defendant as the custodian of those records.

27.

**D.      Review of Mental Health Records**

The trial court determined the records from Kaweah Health were irrelevant and the records from the Tulare County Health and Human Services Agency were inadmissible under Evidence Code section 352.  We have reviewed the sealed records and agree with the trial court's assessment that they contain little to no evidence of plausible value to the defense.

The records from Kaweah Health postdate the offense in this case.  They shed no light on A.S.'s mental status at or near the time of the offense.  They contain no exculpatory information.  The records are, in short, immaterial.

Although the records from the Tulare County Health and Human Services Agency span a wider time period, we likewise conclude they lack substantial evidentiary value.  They contain no exculpatory information and do not pertain to the date of the offense.  Although the records would have provided defense counsel with additional information regarding A.S.'s mental health history, including mental health challenges she faced in the months before and after the offense, it would have been plain to any reasonable juror that A.S. faced such challenges.  Additional information concerning her diagnoses, history, and treatment contained in the sealed mental health records would not have substantially altered that impression.  In this regard we note that A.S.'s testimony was frequently bizarre and unsupported by other evidence at trial.  For example, A.S. testified regarding clones and superheroes.  She testified that her ankles were broken and she stabbed her attacker.  She testified that she owned the property where the attack occurred and that her children, whose names she could not recall, also sometimes lived there.  A.S.'s interviews with law enforcement were, in many regards, similarly fanciful.  The jury had ample information upon which to judge the reliability and credibility of A.S.'s testimony.  We are unconvinced defendant's need for this evidence outweighs the policies the privilege against disclosure is intended to preserve.

The trial court did not abuse its discretion in rejecting disclosure of A.S.'s mental health records, nor were defendant's rights to confrontation and due process violated by their nondisclosure.

## III. CUMULATIVE PREJUDICE

Defendant contends the court's admission of evidence under Evidence Code section 1108, combined with its decision not to disclose A.S.'s mental health records, were cumulatively prejudicial. "Because we have found no error, there is no cumulative prejudice to evaluate." (*People v. Lopez* (2018) 5 Cal.5th 339, 371.)

## IV. COUNTS 1 AND 5 ARE NECESSARILY INCLUDED WITHIN COUNT 3

Defendant contends his convictions for simple assault in counts 1 and 5 are necessarily included within his conviction for assault with intent to commit rape in count 3. Accordingly, defendant argues, his convictions in counts 1 and 5 must be reversed. The People agree.

### A. Additional Procedural Background

The People charged defendant with attempted forcible rape (§§ 261, subd. (a)(2), 664; count 1), battery causing serious bodily injury (§ 243, subd. (d); count 2), assault with intent to commit rape (§ 220, subd. (a)(1); count 3), criminal threats (§ 422; count 4), and sexual battery by restraint (§ 243.4, subd. (a); count 5).

The jury found defendant guilty as charged on counts 2 through 4. On counts 1 and 5, the jury found defendant not guilty of the charged offenses, but guilty on each count of the lesser included misdemeanor offense of assault (§ 240).

Relevant here, the trial court sentenced defendant on count 3 to a term of 25 years to life. On each of counts 1 and 5 defendant was sentenced to county jail terms with credit for time served.

29.

### B.    Analysis

"In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct." (*People v. Reed* (2006) 38 Cal.4th 1224, 1226.) However, "[a] judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' " (*Id.* at p. 1227.) "When a defendant is found guilty of both a greater and a necessarily lesser included offense arising out of the same act or course of conduct, and the evidence supports the verdict on the greater offense, that conviction is controlling, and the conviction of the lesser offense must be reversed." (*People v. Sanders* (2012) 55 Cal.4th 731, 736; accord, *People v. Sanchez* (2001) 24 Cal.4th 983, 987 [a defendant cannot be convicted of both a greater offense and a necessarily included offense based on the commission of the same act].) An offense is necessarily included within another " 'if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, such that all legal elements of the lesser offense are also elements of the greater. [Citation.] In other words, " '[i]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' " ' " (*People v. Robinson* (2016) 63 Cal.4th 200, 207.)

"An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) Assault with intent to commit a felony under section 220, subdivision (a), requires the additional element that the assault was accompanied by the specific intent to commit one of the enumerated offenses. (§ 220, subd. (a)(1); accord, *People v. May* (1989) 213 Cal.App.3d 118, 128.) As the People concede, the offense of assault is necessarily included within the offense of assault with intent to commit rape. (See *People v. Pierce* (2002) 104 Cal.App.4th 893, 898 [assault with intent to commit rape combines elements of attempted rape and assault]; *People v.*

30.

*Carapeli* (1988) 201 Cal.App.3d 589, 595 [simple assault a lesser included offense of both assault with intent to commit rape and sexual battery by restraint].)

The People concede the record does not disclose facts that would suggest the convictions of simple assault arose out of separate acts or a separate course of conduct from the conviction of assault with intent to commit rape. Accordingly, the People also concede defendant's convictions on counts 1 and 5 must be reversed. We accept the People's concession and will reverse the convictions and vacate the associated sentences. In light of these reversals we will remand the matter for a full resentencing hearing. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "]; *People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425 ["the full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"]; see also § 1260 [on appeal, we may "remand the cause to the trial court for such further proceedings as may be just under the circumstances"].)

## V.  SENTENCING ISSUES

Defendant challenges his sentence on various grounds.

He contends the trial court erred in concluding consecutive sentencing on counts 3 and 4 was mandatory. Accordingly, he argues the trial court prejudicially erred in imposing consecutive sentences, and the error violated his due process rights. To the extent defendant forfeited this issue by failing to object, he claims ineffective assistance of counsel. The People argue the claim is forfeited, the court lacked discretion to impose concurrent sentences,[7] and the court's comments at sentencing reflect it would not have

---

[7] The People's argument relies on *People v. Henderson* (2020) 54 Cal.App.5th 612, which recently was reversed by *People v. Henderson* (2022) 14 Cal.5th 34.

31.

exercised its discretion to impose concurrent sentences had it been permitted to do so. Accordingly, the People contend remand would not produce a more favorable sentence.

Defendant additionally contends the stayed, upper-term sentence on count 2 is unauthorized under section 1170, subdivision (b), as amended by Senate Bill No. 567 because aggravating circumstances supporting an upper-term sentence were not found true by a jury or stipulated to by the defense. The People argue remand to apply the provisions of Senate Bill No. 567 would be futile because some of the aggravating circumstances were proved by certified records of conviction, it is not reasonably probable a jury would have failed to find the other circumstances true, and the record reflects the court would have imposed the upper term so long as it was supported by some valid aggravating circumstances.

Defendant also contends remand is required for the court to exercise its newly afforded discretion to punish him under a count providing for a lower sentence pursuant to section 654, as amended by Assembly Bill No. 518. The People again argue remand would be futile because the record reflects the trial court's intent to impose the maximum sentence.

Finally, defendant contends the abstract of judgment must be corrected to reflect the court's oral pronouncement that defendant's fines and fees were ordered stayed. The People do not respond to this argument.

We conclude we need not reach these arguments. We have already determined the matter must be remanded for a full resentencing hearing in light of the reversals on counts 1 and 5. On remand, defendant may seek relief under the law in effect at the time of such further proceedings. Upon the conclusion of such proceedings, the trial court shall prepare an amended abstract of judgment accurately reflecting the judgment imposed.

## **DISPOSITION**

Counts 1 and 5 are reversed and the associated sentences are vacated. The matter is remanded for further proceedings, to include resentencing in accordance with this opinion. In all other respects, the judgment is affirmed.


DETJEN, J.

WE CONCUR:


LEVY, Acting P. J.


POOCHIGIAN, J.

33.